CARRIE J. MCGRATH, Appellant, v. JAMES RAYMOND MCGRATH, Appellee.

FEBRUARY 7, 1928.

*Meyerhoff & Watts*, for appellant.

*Ed. Fackler, Jr.*, for appellee.

EVANS, J.—The parties were married in February, 1922. Each of them owned very little property. The plaintiff had about $400 in money, four cows, and a few hogs. Her parents furnished her with household goods. The defendant had even less property than the plaintiff had. The plaintiff was the only child of her parents. Her father was the owner of two farms, each containing a quarter section. One of these farms was occupied by plaintiff's parents, and the other was rented to the young couple. They continued on this farm throughout 1922, 1923, and 1924. The plaintiff's father, Holbrook, was in ill health, and died in June, 1923. Before his death, he either devised or conveyed all his property to his wife, who survived him. Early in their married life, there had been some friction between these parties over repeated requests by the defendant that his wife sign notes with him, and over his request that she allow him to use the $400 of money which she had. The more serious troubles, however, began after the death of Mr. Holbrook. According to plaintiff's version, these troubles began with the angry protestations of her husband because Mr. Holbrook had turned over all his property to Mrs. Holbrook, and had made no provision for his daughter. He angrily accused his mother-in-law, in the presence of his wife, of having brought about such result improperly, and he threatened to prosecute her to the penitentiary. According to the defendant's version, the only trouble he had was with his mother-in-law, in that she was dictatorial and used harsh language towards him, which he resented with quite equal spirit. One form of his resentment was his refusal or neglect to pay his rent. He claims no improper conduct on the part of his wife in connection with any of these matters. After her marriage, the plaintiff suffered much ill health. Her first child was born in February, 1923, and her second child in May, 1925. For many months prior to the birth of her second child, she had been confined to her mother's home,

with serious illness, and was nursed and cared for by her mother from November, 1924, throughout the year 1925. During the year 1925, the husband hired out as a farm hand to a neighbor, —the farm not being occupied by them. That the plaintiff was at all times in a highly nervous state is testified to by the defendant. She was easily frightened. She was a small woman, weighing 98 pounds at the time of her marriage, though somewhat heavier in weight at the time of the separation. The case presented to us involves only the question of fact as to whether the defendant was guilty of such cruel and inhuman conduct as to entitle the plaintiff to a divorce. After her illness in 1925, the plaintiff and defendant moved back upon the farm, in January, 1926. Shortly before the separation, an altercation ensued, which was testified to by plaintiff as follows:

"I was at home on Saturday night, and he told me to leave, and I didn't do it, and I was standing there, and he said, 'Go before I have to knock you;' and I got almost to the gate, and he caught me and dragged me back, * * * I said Raymond threatened me out by the gate, and took me by the neck. He threw his arms around my neck and dragged me back to the house. This was out at our house. I was out there by myself at that time. I said that arose over money matters. He wanted me to sign a note with him. I did not want to do that."

She also testified:

"A. I left him because he threatened to kill me, and he put me up behind the stove and put his arms around me, and said, 'I could kill you.' Q. When was that? A. May 3d. * * * I said he threatened to kill me. He put his hands around my neck."

The event of May 3d occurred toward evening. She left her home, and sought refuge in the home of a neighbor, the witness Casey, where she remained for a week. For several days she was almost in a state of nervous collapse. She was afraid to be left alone, even in her own room, and Mrs. Casey slept with her. Later, she went to the home of her mother, who was then residing in Corning. The plaintiff's testimony is somewhat meager in volume; but, if found to be true, it is substantial in its character. The defendant was a witness in his own behalf, and denied the plaintiff's testimony, in the following terms:

"I heard her testify that I threatened her to put her mother

in the penitentiary. I did not do those things. I did not grab her by the neck and drag her from the gate over to the house. I never laid my hands on her in any way or at any time with meanness.''

The foregoing was his entire testimony on the real issue in the case. It is urged that the testimony of the plaintiff was without corroboration, and that the plaintiff must fail for that reason. The witness Casey testified to a conversation with the defendant concerning the trouble between himself and the plaintiff, as follows:

''He made the remark that he didn't know why she left him, and I told him that she told me he ordered her off of the place, and that she started, and when she got about to the road, he grabbed her by the neck and made her come back; and I says, 'You frightened her so that she was scared;' and the answer that he gave me was: 'I don't remember anything about it, if I did. I must have been crazy.' ''

The defendant met the testimony of Casey with this faint denial:

''I do not remember conversation with L. L. Casey on Saturday night when he asked me why I struck and choked my wife. I do not remember saying that I 'didn't remember whether I did it or not; that if I did, I had forgotten about it.' ''

It is very manifest from the record that there was some cause for the plaintiff's leaving her home on the evening of May 3d, and that there was some trouble between her and her husband. He did not testify to his version of that event. He has rested his defense solely upon his blanket denial above quoted, and his perfunctory denial of recollection of the alleged later conversation between him and the witness Casey. Though the volume of plaintiff's testimony is small, it is strictly to the point. If the event could have been explained so as to put upon it a different color from that which it took under plaintiff's testimony, the defendant could have made the explanation. He offered none. We are unable, on this record, to discredit her testimony to the effect that he used violence upon her person, and that he did threaten to kill her. Mitigation for such conduct is not easily conceived of. The wife was frail, nervous, and timid. If she had been otherwise, there could be no ready excuse for violence upon her, or for the threat to kill. When her physical

condition is considered, the conduct of the defendant takes on an extremely reprehensible aspect. She testifies that she is in fear of her husband, and that she cannot bring herself to live with him or to be alone with him. Her condition during the week at the home of the witness Casey is corroborative of her contention in that regard. According to the testimony of the defendant as to later conversations with her, she has maintained her attitude reluctantly and sorrowfully, and not defiantly or vindictively. Upon this record, we are quite satisfied that she was and is in a state of fear of her husband, and that his conduct is responsible for her attitude in that respect.

We reach the conclusion that she is legally entitled to a decree of divorce, and it will be so ordered. No question of alimony is presented. Neither party has any substantial property. The cause will be remanded, with directions to enter a decree of divorce for the plaintiff, with full power to the district court to make such orders for the custody and support of the minor children as to it shall seem proper.—*Reversed.*

STEVENS, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.